UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

In re

BR FESTIVALS, LLC,                          No. 14-10175

                                Debtor(s).
_____/

BR FESTIVALS, LLC,

                                Plaintiff(s),

           v.                                 A.P. No. 14-1024

JASON W. JOHNSON, et al.,

                                Defendant(s).
_____/

                                Memorandum After Trial
                                _____

I. Background

    Chapter 11 debtor in possession and plaintiff BR Festivals, LLC, was formed in December, 2012, to stage an outdoor music festival in Napa, California, known as "Bottlerock," from May 9 - 13, 2013. Defendant Jason W. Johnson was an original manager and 35% owner, having contributed $1 million in cash. The other two managers were Robert Vogt, who resigned in 2013, and Gabriel Meyers.

1

The operating agreement provided that if BR Festivals needed cash Johnson had the first right to loan it funds, on an unsecured basis, with interest at 10%. On January 22, 2013, Johnson exercised this right by loaning BR Festivals $1 million.

The operating agreement gave BR Festivals the right to buy out Johnson for $2 million any time before April 30, 2013. If BR Festivals exercised this right, it was also obligated to repay any loans it owed to Johnson, with accrued interest.

Bottlerock was doomed to be a financial failure from the very start, due to the lack of experience of the managers and undercapitalization. Vogt, who was making most of the decisions, seriously underestimated the expenses of staging such a large event and over-estimated the expected revenues. However, the ultimate failure of the concert was masked for a considerable time by advance ticket sales, optimistic projections and wishful thinking.

Believing that Bottlerock would be a financial success, Vogt and Meyers decided to exercise the option to buy out Johnson, even though it would cost BR Festivals $1 million more than Johnson had contributed. They found two new investors, who agreed to invest a total of $3 million in the form of a note for $3 million secured by all assets of BR Festivals. In return for the loan, the new investors were given an immediate 10% membership interest in BR Festivals and the right to convert the note into additional membership interest if it was not paid in full by May 31, 2013. The note provided that "The Company shall use the proceeds of the Note to pay off the consideration due to Jason Johnson and return his Membership Interest to the Company within one day of funding."

On April 29, 2013, the new investors wired a total of $3 million to BR Festivals. Later that day, BR Festivals wired $3,025,849.32 to Johnson's wholly-owned corporation, defendant DeVille Enterprises, Inc. This sum represented Johnson's original $1 million investment, the $1 million additional buyout price, the $1 million loan, and $25,849.32 in accrued interest. Immediately after the transfer, BR Festivals had $662,681.00 in cash in its account at Chase Bank, $50,000.00 in receivables and $5,038,526.50 in prepaid performers' fees, all of which became collateral of the new investors.

When all the dust settled after Bottlerock was over, it became clear that BR Festivals had lost at

2

least $6 million and was insolvent. It filed its Chapter 11 petition on February 5, 2014 and has been a debtor in possession since that date.

By this adversary proceeding BR Festivals, as a Chapter 11 debtor in possession entitled to exercise the rights of trustee by virtue of § 1107(a) of the Bankruptcy Code, seeks to recover the $3,025,849.32 from Johnson. It alleges that the transfer was avoidable as either a preference or a fraudulent transfer and is recoverable under California law forbidding certain payments to insiders by an insolvent entity. The court will address these claims separately.

II. Preference

A simple reading of § 547(b) of the Bankruptcy Code makes the $1 million loan repayment to Johnson avoidable. BR Festivals paid Johnson, an insider, $1,025,849.32 on account of a pre-existing debt at a time when it was insolvent and within one year of bankruptcy. The payment allowed Johnson to be paid in full while ordinary creditors stand to recover very little. It is hard to imagine a more classic preference. However, the court must consider the Earmarking Doctrine in determining if the transfer is avoidable.

The Earmarking Doctrine dictates that a preference is not avoidable where a new lender has loaned money to the debtor for the purpose of paying off the recipient of the preferential payment. It is generally considered a court-made equitable exception to the provisions of § 547 (*In re Kemp Pacific Fisheries, Inc.,* 16 F.3d 313, 316n2 (9th Cir.1994)), although justified as consistent with the statute on the theory that the debtor had no property interest in the newly-lent funds (as required by § 547(b))(*In re Adbox, Inc.,* 488 F.3d 836, 841-42 (9th Cir. 2007)) or that the contemporaneous exchange for new value defense of § 547(c)(1) applies ("The Earmarking Defense to Voidable Preference Liability; A Reconceptualization," 73 Am.Bankr.L.J. 591 (1999)). However it is characterized, the Earmarking Doctrine is to be narrowly construed. 5 **Collier on Bankruptcy** 16th Ed., ¶ 547.03[2][a], p. 547-21.

Regardless of whether the Earmarking Doctrine is considered a purely equitable doctrine, a test of whether the debtor had an interest in the funds or an affirmative defense, virtually all authorities

3

agree that if collateral is given to the new lender who provides funds to pay off an old unsecured creditor then the old creditor receives an avoidable transfer to the extent of the value of the collateral. *In re Superior Stamp & Coin Co., Inc.,* 223 F.3d 1004, 1008n3 (9th Cir. 2000); **Collier on Bankruptcy,** Id**.** at p. 547-25 ["A payment by the debtor with funds earmarked for a specified unsecured creditor will be avoidable as a preference to the creditor if the debtor had to grant a security interest to the new lender."]; *In re Moses,* 256 B.R. 641, 651 (10th Cir. BAP 2000)[The Earmarking Doctrine "never applies in situations where an unsecured debt . . . is replaced by a secured debt . . . ."; 73 Am.Bankr.LJ at 602 - 03. Johnson blithely dismisses this point by asserting, without foundation, that its collateral had little or no value. The evidence established quite the opposite.

Johnson argues that the date for valuing the collateral given to the new investors was May 16, 2013, when they filed their UCC-1. However, that merely perfected the security interest as to third parties; as between the new investors and BR Festivals, the security interest was effective as of its granting on April 28, 2013, so that is the date of the transfer for preference determination. See *In re Royal Golf Products Corp.,* 908 F.2d 91, 93-95 (6th Cir. 1990). At that time, in addition to over $600,000 cash in the bank, BR Festivals had prepaid entertainers over five million dollars. The fact that these prepayments later became ticket sales does not mean they had no value.[1] No evidence was presented that any of the performers failed to honor their commitments. It is conceivable that a prepayment to a band might have a value far in excess of the amount prepaid where, for example, an old band member suddenly decided to rejoin the band for the prepaid performance, but there was no evidence of that either. The court accordingly adopts the book value of $5,038,526.50 as the value of the prepaid entertainment.

The court finds that BR Festivals has proved all of the elements of a preference as to the repayment of Johnson's $1 million loan and that the Earmarking Doctrine does not insulate the

---

[1] Nor does it matter that the new investors, for whatever business or strategic reason, decided well after the fact to waive their security interest. At the time of their loan, their collateral had substantial value.

4

preference from avoidance because the new lender took collateral having a value in excess of the repayment. The court further finds that Johnson has not met his burden as to any affirmative defense.[2] Accordingly, the loan repayment to Johnson of $1,025,849.32 will be avoided and recovered by BR Festivals.

II. Fraudulent Transfer

Section 548(a)(1)(B) of the Bankruptcy Code allows avoidance of an interest of the debtor in property made within two years before bankruptcy, if the debtor received less than reasonably equivalent value in exchange and the debtor was at the time insolvent, or was engaged in a business for which property remaining was an unreasonably small capital, or the debtor intended to incur debts beyond the debtor's ability to pay as they matured. As noted above, BR Festivals was insolvent almost from the beginning and was certainly insolvent on April 28, 2013. On that date, it had unreasonably small capital for its business and intended to incur debts beyond its ability to pay. These facts were masked by the inexperience of BR Festival's managers and the positive cash flow created by advance ticket sales, but knowledge is not an element of a constructive fraudulent transfer pursuant to § 548(a)(1)(B).

BR Festivals got nothing for the $2 million it paid to Johnson for ownership interest. Johnson again invokes the Earmarking Doctrine, but that doctrine is a less availing argument against a fraudulent transfer claim than the court found it in the preference context.

Johnson argues that in substance the new investors were just buying out his ownership interest, so that the estate was not diminished. However, this is clearly not the case. The new investors could not have accomplished their goals merely by paying Johnson directly, because they also wanted a

---

[2]Specifically, there was nothing in the least "ordinary" about this transaction. Extending the ordinary course of business defense of § 547(c)(2) to these facts, as Johnson urges, would effectively erase preference recovery and make those drafters of the Bankruptcy Code who are no longer with us turn over in their graves.

5

security interest in BR Festival's assets. By going through BR Festivals, $1 million in ownership equity was transmuted into $2 million in secured debt. This diminished the BR Festival estate by $2 million, for which the estate got nothing.

While the Earmarking Doctrine is usually applied to preference claims, it may be invoked, in a proper case, to fraudulent transfer claims. *In re Chase & Sandborn Corp.,* 813 F.2d 1177, 1182 (11th Cir. 1987). However, this is not a proper case. As Johnson himself noted in his trial brief, "Fraudulent transfer law in the bankruptcy context focuses on the preservation of the assets of the estate, specifically to benefit unsecured creditors." By the transaction, general unsecured creditors were instantly deprived of a pro rata interest in BR Festivals estate so that Johnson could be repaid in full and bought out with a profit. The estate was diminished by more than the amount of the total payments to Johnson, so avoidance creates fairness, not a windfall. As noted above, the Earmarking Doctrine must be applied narrowly. It cannot be stretched to cover the facts of this case.

III. Illegal Dividend

As an alternative theory, BR Festivals argues that the $2 million buyout of Johnson violated part of California's Beverly-Killea Limited Liability Company Act.[3] It is clear that California Corporations Code Section 17254(a) was violated by the buyout. That section provides, in pertinent part:

> (a) No distribution shall be made if, after giving effect to the distribution, either of the following occurs:
> (1) The limited liability company would not be able to pay its debts as they become due in the usual course of business.
> (2) The limited liability company's total assets would be less than the sum of its total liabilities..."

The problem with BR Festivals' argument is that the remedy for violation of the section is contained in § 17254(e), which provides that "A member . . . is obligated to return a distribution from a limited

---

[3]The California statutes relied upon by BR Festivals were replaced with other statutes in 2014. The court discusses the statutes as they existed during 2013.

6

liability company to the extent that . . . the member . . . had actual knowledge of facts indicating the impropriety of the distribution . . . ."

Factually, the matter is not as clear as Johnson argues. There are some facts from which the court could infer that Johnson had actual knowledge of BR Festivals' financial problems. Most notably, while he readily exercised his right to loan BR Festivals the initial $1 million, he later declined a request from Vogt to make an additional loan. However, this aspect of the case was not vigorously pursued by BR Festivals. In the end, the court cannot say that it proved, by a preponderance of the evidence, that Johnson had the requisite knowledge. Accordingly, the court finds no liability under § 17254.

Section 17255(a) makes a member or manager of an LLC personally liable for distributions made in violation of § 17254, but only if the member or manager voted for the distribution. Since Johnson did not vote for the distribution, it appears that he has no liability under § 17255(a) either.[4]

IV. Conclusion

The payment to Johnson was not, as he styles, in substance just a buyout of his ownership by new investors. The assets of BR Festivals were leveraged in order to finance the buyout; so the funds of the new investors needed to come through BR Festivals rather than be paid directly to Johnson. Because the assets of BR Festivals were encumbered to finance the payment, the Earmarking Doctrine does not afford Johnson an escape from avoidance. He received a preferential payment of $1,025,849.32, and the other $2 million he received was constructively fraudulent as to BR Festivals. Accordingly, BR Festivals shall have judgment against Johnson as prayed, including interest from and

---

[4] The right of the other owners to buy out Johnson was contained in the operating agreement, so that Johnson had no say (and hence no vote) in whether he was bought out. Johnson did agree to the terms of the operating agreement; there is an issue as to whether this could constitute a "vote" within the meaning of § 17255(a). In the absence of any authority or compelling argument by BR Festivals, the court declines to so find.

7

after April 29, 2013, as prayed.[5]

This memorandum constitutes the court's findings and conclusions pursuant to FRCP 52(a) and FRBP 7052. Counsel for BR Festivals shall submit an appropriate form of judgment forthwith.

Dated: March 11, 2015

Alan Jaroslovsky
U.S. Bankruptcy Judge

---

[5]BR Festivals does not seek prejudgment interest as to the preference. The court agrees with BR Festivals that since an existing creditor would have a right to prejudgment interest on the fraudulent transfer claim then BR Festivals has that right also pursuant to § 544(b)(1) of the Bankruptcy Code.